# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **Central Santa Lucia, L.C.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 22-367-JLH |
| | § | |
| **Expedia Group, Inc.,** | § | **PUBLIC REDACTED VERSION** |
| | § | **FILED - JUNE 3, 2024** |
| Defendant. | § | |
| | § | |

## EXPEDIA GROUP, INC.'S MOTION FOR SANCTIONS
## UNDER RULE 11 AND THE COURT'S INHERENT POWERS

## I.  **INTRODUCTION**

Plaintiff Central Santa Lucia, L.C. ("CSL") and its lawyers have misled both the Court and defendant Expedia Group, Inc. regarding a case-dispositive issue: the date CSL purportedly acquired its claim to the property underlying its Helms-Burton cause of action. The Helms-Burton Act and case law interpreting it are clear: a person may not bring an action for trafficking in confiscated property under the Helms-Burton Act unless the person acquired ownership of the claim to the property at issue before March 12, 1996—the Act's enactment date.

CSL alleged in its original and amended complaints that it acquired ownership of its claim on March 7, 1996, five days before the statutory cutoff. (*See* Compl. ¶ 7, D.I. 1; Am. Compl. ¶¶ 7, 11, 12, D.I. 21; 2d Am. Compl. ¶¶ 7, 11, 12, D.I. 89.)[1] Specifically, CSL asserts that it acquired the claim to the property through documents titled "Assignment of Rights," that purport to have been executed as of March 7, 1996. But the critical allegation that the assignments are meant to support is a lie, and CSL fabricated the assignments to support that lie. Worse still, when Expedia Group first confronted CSL and its counsel with this fact, they compounded their misconduct. And even when faced with irrefutable evidence that the assignments were not created until **years** after March 7, 1996, CSL refuses to withdraw its frivolous and false allegation.

Expedia Group and the undersigned counsel do not file this motion lightly. But the misconduct in this case is indefensible, and the prejudice to Expedia Group is grave. Expedia Group therefore requests that this Court sanction CSL and its attorneys pursuant to Rule 11 and/or the Court's inherent authority by dismissing CSL's suit and awarding Expedia Group the attorneys' fees, litigation expenses, and court costs it incurred defending this frivolous suit.

---

[1] After Expedia Group served CSL and its counsel with this Motion, CSL filed its Second Amended Complaint ("SAC"), maintaining the same frivolous allegations. (*See* SAC, D.I. 89.) Expedia Group updated this version of the Motion to reflect the allegations in the operative complaint. Aside from this update, two explanatory footnotes (this one and Part II.E n.2), and the correction of typos, this version of the Motion is the same as the version Expedia Group previously served on CSL and its counsel.

4878-0151-8231

## II.    BACKGROUND & EVIDENCE

### A.    The Helms-Burton Act's Date-of-Acquisition Requirement

Title III of the Helms-Burton Act—subject to certain limitations and definitions—purports to grant U.S. nationals who "own[ ] the claim" to "property" that "was confiscated by the Cuban government" the right to sue and recover damages from any person that "traffics" in such property. 22 U.S.C. § 6082(a)(1)(A). But the Act includes an unequivocal limitation on this right of action: "In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property **unless such national acquires ownership of the claim before March 12, 1996**," which was the Act's enactment date. 22 U.S.C. § 6082 (a)(4)(B) (emphasis added). Thus, if a Helms-Burton plaintiff cannot "plausibly allege" that it acquired the claim to the property at issue before March 12, 1996, that plaintiff cannot bring a Helms-Burton action. *E.g.*, *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 330 (D. Del. 2021), *aff'd*, No. 21-1842, 2022 WL 3538221 (3d Cir. Aug. 18, 2022).

### B.    CSL's Alleged Acquisition of its Claim

CSL is well aware of this restriction on the ability to bring Helms-Burton claims. (*See* SAC ¶ 31, D.I. 89.) CSL alleges that it acquired its claim to the confiscated property at issue—which CSL describes as more than 100,000 acres of land in Cuba—on March 7, 1996, when several individuals purportedly transferred their rights to CSL. (*Id.* ¶¶ 7, 8, 11, 12.) According to CSL's allegations, a Cuban corporation called Santa Lucia Company, S.A. (the "Cuban Corporation") owned a sugar mill on the confiscated property and approximately 59,400 acres of land, while a Cuban partnership (the "Cuban Partnership") called Sociedad Civil Sanchez Hermanos owned land surrounding the sugar mill. (*See id.* ¶ 8.) CSL asserts that members of the so-called Sanchez-Hill family owned the shares of the Cuban Corporation and interests in the Cuban Partnership in equal proportions, and that a subset of those individuals "each transferred their entire interests in the Confiscated Property to [CSL]" on March 7, 1996, in anticipation of the Helms-Burton Act. (*Id.* ¶ 11.)

2

C.    The Fraudulent "Assignment of Rights" Documents

In support of that allegation, CSL produced in discovery an "Assignment of Rights" under which the former members of the Cuban Partnership purported to "assign and transfer" certain interests related to the property to CSL (the "Partnership Assignment"), as well as a separate "Assignment of Rights" under which the owners of the Cuban Corporation purported to "direct and authorize its appropriate officers to duly assign and transfer" certain interests related to the property to CSL (the "Corporation Assignment"). (Ex. A, Partnership Assignment; Ex. B, Corporation Assignment.) Both documents state that they were executed "as of" March 7, 1996.

Both assignment documents include an identical notarization page executed by Nicolás J. Gutiérrez, Jr. In addition to being a notary, Gutiérrez was once a Florida attorney. In 1996, while he was an associate at the law firm of Adorno & Zeder, Gutiérrez represented CSL and its founders in forming the company. (*See* Ex. C, CSL Articles of Organization.) Gutiérrez has been a manager and/or officer of CSL since at least 1998. (*See id.*; Ex. D, CSL 1998 Annual Report; Ex. E, CSL 2023 Annual Report.) The notarization page attached to both documents certifies that the signatories to the assignment documents appeared before Gutiérrez and executed the documents as of "**this** 7th day of March, 1996":



(Ex. A, at 4; *accord* Ex. B, at 3.)

This attestation is false on its face. The assignment documents were not notarized on March 7, 1996. The notary stamp that Gutiérrez used states that his notary commission (CC728895) would expire on May 18, 2002. But Florida notary commissions are valid for only four years. FLA. STAT. § 117.01(1) (1995 & Supp. 1996) ("The Governor may appoint for a term of 4 years as many notaries public as he or she deems necessary….") (attached as Ex. G). Thus, the earliest date Gutiérrez could have received and used the notary stamp in question was May 1998—over two years **after** he purportedly attested that the partners executed the Partnership Assignment. Indeed, the Florida Division of Corporations has confirmed that it did not issue Gutiérrez the commission number that appears on the Partnership Assignment (CC728985) until May 19, 1998. (Ex. H, Email Exchange between D. Shank and Florida Div. Corporations.)

The notarization is obviously false for another reason. It states that it was signed in the "City of Miami, **County of Miami-Dade**, State of Florida." But on March 7, 1996, there was no Miami-Dade County. The Florida county now known as Miami-Dade was called "Dade County" until after a referendum on November 13, 1997— over a year and half after Gutiérrez purport-edly attested that the Partnership Assignment was executed before him. (Ex. F, Amendments to County Charter, Nov. 13, 1997.)

What is more, contrary to CSL's allegations, the Corporation Assignment does not actu-ally purport to assign anything to CSL at all. Instead, it merely "directs and authorizes" its offic-ers to "duly assign and transfer all of [the corporation's] rights, claims and interests in the in-come produced by any of the properties in Cuba belonging to [the corporation]…as well as any damages to be obtained…to [CSL]." (Ex. B.)

### D.    Gutiérrez's Previous Bar Suspension for Falsifying Evidence

This case is not the first time Gutiérrez falsified documents to serve as the basis of a law-suit filed on behalf of one of his clients. In 2012, the Supreme Court of Florida suspended Gutiérrez from the practice of law because he altered a previously executed memorandum of un-derstanding and then filed a lawsuit based on and attaching that altered memorandum. (*See* Ex. I, Conditional Guilty Plea and Consent Judgment for Discipline.) Specifically, Gutiérrez pleaded

4

guilty to, among other things, falsely creating a new jurat for a notarized signature in the altered document and backdating the notarization. (*Id.* at 3–4.)

The fact that Gutiérrez's law license was suspended is no secret. A quick Google search leads to articles about his suspension, as well as the order of suspension and referee's report. (Ex. J, Shank Decl. ¶¶ 3–4.)

### E.    The False Explanation for the Fraudulent Assignments

In light of the facially fraudulent notarization, signed by a suspended attorney with a history of falsifying evidence for lawsuits, it was clear that the assignments were fabricated and, contrary to CSL's allegations, the signatories did not execute the assignment documents on March 7, 1996. Instead, the **earliest** the signatories could have executed the assignment—and thus assigned their claim to CSL—was the date Gutiérrez obtained the notary commission under which he notarized the assignments: May 19, 1998, more than two years **after** the Helms-Burton Act's date-of-acquisition cut-off.

Any reasonable investigation would have revealed that the notarized assignments were fabricated evidence. That being so, on November 9, 2023, Expedia Group made the difficult decision to prepare and serve on CSL and its counsel a motion for sanctions, thereby commencing the 21-day safe-harbor period under Rule 11. Fed. R. Civ. P. 11(c)(2). (Ex. L, Initial Motion for Sanctions.) Counsel for the parties conferred the following day. But rather than express surprise or concern about the revelation that they had filed a lawsuit based on falsified documents, CSL's counsel reacted with defiance, compounding the misconduct by advancing a second, equally dubious lie in an attempt to explain away the first.

Remarkably, **CSL's lawyers admitted that they already knew that the notarizations—which purport to be executed on "this the 7th day of March, 1996"—were actually executed years later**. Yet, they insisted that the assignment documents themselves—to which the notarizations were attached—were nevertheless signed on March 7, 1996. (Ex. J ¶¶ 5–8.) Of course, this illogical and implausible story led Expedia Group's counsel to ask a follow-up question: Why would Gutiérrez execute false, backdated notarization pages years after the underlying

documents were supposedly executed? According to CSL's lawyers, Gutiérrez prepared the backdated notarizations at the behest of the U.S. State Department. But CSL's lawyers could not explain why the U.S. State Department would make such a request. (*Id.*)

And for good reason: it was another lie. As explained in more detail in Part II.G below, the metadata embedded in the native Microsoft Word versions of the assignments and the notarization page (which were produced after Gutiérrez falsely testified that he did not possess them) conclusively revealed that both the assignments and the notarization pages were not created until the year **2000**. *See infra* Part II.G. That metadata only confirmed what was already obvious. Any reasonable inspection of the face of the assignments, as well as other readily available materials, reveals that both the assignments and the notarization pages were created at the law firm of Rafferty, Gutiérrez & Sanchez-Aballi LC ("RGSA")—a firm that **did not exist until 1998**—not at Adorno & Zeder, where Gutiérrez worked as an associate in March 1996. (Ex. K, Gutiérrez Dep. 101:23–102:6, 104:24–105:5, 134:9–14, 137:18–138:6.)

For starters, the notarization pages—which Gutiérrez admits he created and signed in the year 2000 while at RGSA (*see id.* at 182:2–12)—share many attributes with the assignment documents. The assignments and notarization page are not only typed in the same font and format, but they were also stored in an identically named folder. Specifically, both the body of the Partnership Assignment and the notarization page include a field, printed at the bottom of the documents, identifying their filenames and the folder path where they were stored when they were printed. (*See* Ex. DD, Capsicum Rep. 13.)[2] And those fields show that both documents were printed from the same folder:

I:\1092.001\AssignmentofRights.4.doc

I:\1092.001\assignment.CSLLC.DOC

---

[2] After Expedia Group's counsel served this Motion and the Capsicum Report on CSL and its counsel, Capsicum made minor changes and revisions to its Report. Expedia Group promptly provided the updated Report and a redlined version reflecting the changes to CSL and its counsel. The final version of the Report is attached as Exhibit DD.

6

(Ex. A at 1–2 (footer of assignment of rights document); *id.* at 3 (footer of notarization page); *see also* Ex. B at 3 (footer of notarization page).)

The name of that folder—"1092.001"—is not random. Rather, it is the client number that was used for CSL **at RGSA**:

| Client Number: | 1092.001 (NJG) |
| Corporate Name: | CENTRAL SANTA LUCIA, L.C. |
| Reg. Agent: | Nicolás J. Gutiérrez, Jr. c/o RGSA |

(Ex. M, CSL Corporate Profile; Ex. K, at 120:8–24, 121:21–122:23; *see also* Ex. N, N. Gutiérrez Ltr. to Idris Díaz (April 10, 2000).) And this same filepath format—"I:\[client number]\[name of file]"—can be seen in many documents that Gutiérrez and his colleagues at RGSA created for other clients as well. (*See* Ex. O, Lexodos Grp, LLC Formation Docs. 2; Ex. P, Pathway Real Estate LC Formation Docs 2–4; Ex. Q, Vichuquen Corp. Articles of Incorporation 2–4.)

By contrast, none of the scores of publicly available documents that Gutiérrez and other attorneys created at Adorno & Zeder—where Gutiérrez worked in 1996—have any of the characteristics found in the assignments or the notarization page. This includes several documents related to the formation of CSL. (*See* Ex. C; Ex. GG, CSL Regulations; Ex. R, CSL Operating Agreement; Ex. S, N. Gutiérrez Ltr. to S. Hardesty (Oct. 25, 1996); Ex. T, N. Gutiérrez Ltr. to M. Rannenberger (June 12, 1996); *see also* Ex. K, at 36:3–10, 37:2–6, 43:4–15, 55:13–21, 60:12–61:17, 68:2–15, 70:20–71:1, 83:5–8, 259:8–22.)

The falsity of Gutiérrez's story—that the State Department asked Gutiérrez to create false, backdated notarizations for assignments that were allegedly signed and submitted four years earlier—was also obvious from the complete absence of any evidence supporting it. In fact, Gutiérrez's correspondence with the State Department and other parties only further demonstrates that neither the assignments nor the notarization page were created until the year 2000, when CSL was attempting to use the threat of the State Department's enforcement of Title IV of

7

the Helms-Burton Act to extract a settlement from a hotel operator. (*See* Ex. HH, Ltr. from N. Gutiérrez to M. Bradfield (July 3, 2000) (following up on an earlier meeting between CSL, State Department officials, and counsel for Melia hotels, planning future meeting in July, and stating, "**we will forward to you our relevant assignment documents, in due course**" (emphasis added); Ex. II, Ltr. from N. Gutiérrez to C. Shapiro (**July 19, 2000**) (stating that "[a]s requested, **we will also provide [State Department officials and counsel for Melía] with our relevant claim assignment documents**" at an upcoming meeting (emphasis added)).

Indeed, CSL's claim that the State Department solicited a backdated notarization appears to be a recent invention. In a case that CSL brought against hotel operator Melia in Spanish Court based on the same claim at issue here, Gutiérrez submitted an affidavit in the Spanish Court purporting to explain other inconsistencies in signatures on the assignments. (Ex. JJ, Translation of Gutiérrez Aff. (July 29, 2020).) But Gutiérrez's affidavit says nothing about the notarizations being backdated. Instead, Gutiérrez swears that he delivered the **notarized** assignments to the State Department **in 1996**. (*Id.* ¶ 6 ("More than 24 years ago now,…I personally delivered an original of each of the two Assignments…to…U.S. federal officials.").)

### F.    CSL's Solicitation of False Declarations and Testimony

CSL and its lawyers willfully ignored all of this evidence. Rather than come to terms with and attempt to remediate the harm caused by CSL's false allegations, CSL and its lawyers instead rushed to solicit false testimony to bolster those false allegations.

#### 1.    Gutiérrez's Declaration and Deposition

CSL's counsel first obtained a declaration from Gutiérrez, in which he falsely swears under penalty of perjury that the assignment documents were executed by all of the signatories in his presence on March 7, 1996. (Ex. U, Gutierrez Decl. ¶ 5.) He then swears to the same implausible story that CSL's lawyers told during the conference with Expedia Group's counsel, i.e., that years later he prepared the false, backdated notarization and attached it to the assignments because the U.S. State Department asked him to. (*Id.* ¶¶ 13–16.)

But Gutiérrez's declaration also included something new: a **third** assignment document. (*See* Exs. U-2 & U-6; Ex. V, Alternative Corporate Assignment.) This newly disclosed assignment, also dated March 7, 1996, is very similar to the Corporate Assignment except that it actually purports to "assign[] and transfer" the Cuban corporation's rights to CSL (*id.* at 1), rather than simply "direct[ing] and authoriz[ing] its appropriate officers" to do so (Ex. B, at 1). Gutiérrez's declaration swears that this assignment was also executed in his presence on March 7, 1996, and that he prepared and executed the notarization page years later. (Ex. U ¶¶ 4–5, 10, 13–15.) But it bears all of the same RGSA hallmarks as the other two assignments.

Gutiérrez repeated the lies from this declaration during his deposition. He testified that on March 7, 1996, all 13 signatories—some of whom lived in different states—came to Adorno & Zeder's offices in Miami and, once together, signed all three of the assignment documents in his presence. (Ex. K, 179:19–25, 313:15–314:19.) He also testified that he prepared and executed the notarization pages during the summer of 2000 at the request of the U.S. State Department. (*Id.* at 180:1–182:6.) He therefore acknowledged that, according to his story, the assignments were created while he was an associate at Adorno & Zeder (*id.* at 184:10–185:5), whereas the notarization pages were created at RGSA (*id.* at 181:23–182:1). But when he was confronted with evidence showing that the assignments were also created at RGSA, Gutiérrez manufactured a series of dubious, conflicting explanations.

Gutiérrez initially testified that he began representing CSL and the Sanchez-Hill family when he worked at Adorno & Zeder. (*Id.* at 35:17–36:2.) He also testified that he used (through staff) Adorno & Zeder's established filing and accounting systems, but was not familiar with either. (*Id.* at 41:18–42:2, 56:4–23). But when confronted with the evidence that the assignments, like the notarization page, bore RGSA formatted filepath fields and CSL's RGSA client number, Gutiérrez abruptly changed his testimony and claimed that the client number was actually created for CSL at a different firm—Kelley Drye & Warren LLP—where Gutiérrez worked as a junior associate from 1988 to 1992, **years before CSL was even formed**. (*Id.* at 122:4–128:15.)

And despite his earlier testimony that he lacked any knowledge of the filing and accounting systems at the firms that employed him, Gutiérrez suddenly claimed to have employed a personal "internal…client number" system in which he continued to use the client number purportedly assigned to CSL at Kelley Drye & Warren at all of the three other law firms he worked, including Adorno & Zeder, before making it the official client number for CSL at RGSA. (*Id.*) His attempt to explain the presence of RGSA filepath fields on both the assignments and the notarization page was no less contrived and contradictory. (*See id.* 201:11–203:7.)

Gutiérrez's testimony was consistent on at least one point though: he repeatedly testified that he did not retain—and thus does not possess—any electronic files from his time at Adorno & Zeder or RGSA. (*Id.* at 84:16–85:2, 92:3–8, 141:11–19, 236:23–237:5.) But Gutiérrez's convenient claim that he possessed no electronic files would turn out to be just another lie. Not long after Gutiérrez's deposition, CSL's lawyers revealed that they had collected hundreds of RGSA electronic files from two of Gutiérrez's devices, including the native-file versions of the assignment documents. And, as described in more detail below, those native files conclusively prove that the assignments (like the false notarizations) were not created until 2000 and, thus, could not have been executed on March 7, 1996. *See infra* Part II.G.

### 2.    The Other Declarants

CSL's and its lawyers' attempt to cover-up their misconduct did not stop at Gutiérrez's false testimony. CSL and its counsel also procured declarations from the three surviving signatories of the assignments, each of whom is more than 80 years old: (1) Vivian Carta, (2) Lillian Sanchez, and (3) Alfredo Sanchez.

However, Ms. Carta's declaration admitted that she did not actually recall signing the assignments on March 7, 1996 (or any other specific date); she merely presumed that she did so on March 7, 1996, because that is the date written on the documents. (Ex. W, Carta Decl. ¶ 3.)

As for Lillian Sanchez, her declaration stated that she too did "not recall with 100% certainty the exact date [she] signed" the assignments, but she asserted nonetheless that she "signed them two or three weeks after the Cuban Government shot down two Brothers to the Rescue

planes," which occurred in February 1996. (Ex. X, L. Sanchez Decl. ¶ 4.) During her deposition, however, Ms. Sanchez revealed that her lawyer (who is also CSL's lawyer) wrote her declaration, she made no changes or edits to it, and she signed the first draft. (Ex. Y, L. Sanchez Dep. 39:15–50:6.) She also admitted, like Ms. Carta, that she did not actually remember signing the assignments and only presumed they were signed on March 7, 1996, because that is the date written on the documents. (*Id.* at 48:12–19, 61:15–62:17; *see also id.* at 56:11–15.)

Alfredo Sanchez's declaration and testimony are similarly unconvincing. Mr. Sanchez's declaration states that he remembers signing the assignment documents on March 7, 1996. (Ex. Z, A. Sanchez Decl. ¶¶ 5–7.) But Mr. Sanchez's deposition revealed that his purported recollection is unreliable, untruthful, or both. To start, like Lillian Sanchez, Mr. Sanchez admitted that his attorneys (who are also CSL's attorneys) wrote his declaration, and he did not make any edits to the declaration. (Ex. AA, A. Sanchez Dep. 94:2–96:9.)[3] Further, despite his declaration's assertion that he signed three different assignment documents, during his deposition Mr. Sanchez initially did not recall signing more than one, and he did not remember the content of the document or documents he purportedly signed on March 7, 1996. (*Id.* at 93:4–24.) Mr. Sanchez's purported recollection of signing documents on March 7, 1996, also conflicts with his inability to remember many other events during that and other time periods, including signing any other documents for CSL over the years. (*E.g., id.* at 33:8–12, 57:15–58:15, 77:11–80:8, 81:4–21, 83:22–84:18, 128:20–24, 130:3–23, 144:4–147:4.)

Mr. Sanchez also could not explain contradictions between his supposed recollection of the assignment documents and an affidavit that he and some other members of his family signed in August 1998. (Ex. BB, August 1998 Affidavit 1; Ex. N, at 6; Ex. AA, at 85:3–90:7, 102:19–103:23, 105:5–109:13.) Nor could Mr. Sanchez explain why documents from 1996 and 1997

---

[3] In an errata, Mr. Sanchez attempted to change his testimony to say, "Mr. White, who typed the Declaration on his computer…revised it based on what I told him." (Ex. AA, A. Sanchez Dep. Errata 4.) But when Mr. Sanchez's lawyer tied to elicit this testimony from Mr. Sanchez during re-direct examination at his deposition, Mr. Sanchez testified that he did not recall if his lawyer was writing anything down or had his computer out while they met. (*Id.* at 155:20–156:14.)

state that CSL had only five members, when CSL would have had at least 13 members if the assignment documents had truly been executed on March 7, 1996. (*See* Ex. FF, N. Gutiérrez Ltr. to Steven Hardesty at 2 (June 16, 1997) (referring to "**four of the five shareholders of [CSL]**" (emphasis added)); Ex. D at 2 (stating on CSL's IRS Form SS-4 that, as of April 1, 1998, CSL had "5 members"); Ex. AA, at 35:6–36:6.)

But there were two things Mr. Sanchez understood very well. He stands to make millions if CSL recovers the roughly $1.7 billion in damages it seeks in this case. (Ex. AA, 111:22–112:23.) And if the assignments were not actually executed before March 12, 1996, he and the other members of CSL will get nothing. (*See id.* at 114:15–22.)

G.    The Truth Within the Native File Metadata

After Gutiérrez's deposition, CSL's counsel revealed that they retained an expert to conduct a forensic digital collection of two devices owned by Gutiérrez. (Ex. J ¶ 13.) And contrary to Gutiérrez's emphatic testimony that he possessed no electronic files from his time at RGSA, the search of his devices proved otherwise. On December 8, 2023, CSL produced dozens of electronic documents that were created while Gutiérrez was at RGSA, **including the native Microsoft Word files of the assignments**. (*Id.* ¶ 14; Ex. DD, at 4–5.) The metadata in those native files proves what was already obvious: the assignment documents (like the false notarizations attached to them) were not created until the summer of 2000. (Ex. J ¶ 15–16; Ex. DD, at 4–5.)

Any Windows user can easily view the native files' metadata through the document properties. (Ex. J ¶ 15.) The readily accessible metadata shows that the assignments and the notarization page were created, last saved, and printed between May 26 and July 18, 2000. (*Id.* ¶ 15.) Upon seeing the metadata, Expedia Group's counsel immediately contacted CSL's counsel to ask if CSL would finally withdraw its false allegation and hopefully save Mr. Sanchez—who was scheduled to be deposed just days later—from perjuring himself. (*Id.* ¶¶ 17–18.) But once again, CSL and its counsel refused. The next business day, CSL's counsel informed Expedia Group that, far from reversing course, CSL planned to induce yet another witness to "corroborate" that the assignment documents were created in 1996. (*Id.* ¶ 19.) CSL's counsel also claimed that they

12

expected to have a forensic data expert analyze the metadata. (*Id.*) But CSL has yet to share any such analysis or identify any additional corroborating witness. (*Id.* ¶ 20.)

Given CSL's stated intent to dispute the reliability of the metadata, Expedia Group retained its own experts at Capsicum Group to analyze the native-file versions of the assignments. (Ex. DD.) Capsicum's analysis confirms what the other evidence already showed: just like the notarization page, all three of the assignments were created and printed in the summer of 2000 and, thus, could not have been executed on March 7, 1996. (*Id.*)

### H.    This Updated Motion for Sanctions

In light of CSL's and its counsel's conduct following service of the Initial Motion for Sanctions, as well as all of the additional evidence confirming the conclusion of that initial motion, Expedia Group prepared this updated motion, served it on CSL, and informed CSL's counsel that it will file the motion within 21 days of service unless CSL withdraws its false allegations.

### III.    <u>ARGUMENT & AUTHORITIES</u>

This Court has various avenues available to it to sanction CSL and its attorneys. The first is provided by Rule 11 of the Federal Rules of Civil Procedure which states, in part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3). If this or any other requirement imposed by Rule 11 has been violated, a court "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A Rule 11 sanction "may include…an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation, …if imposed on motion and warranted for effective deterrence." Fed. R. Civ. P. 11(c)(4).

Second, the Court can impose sanctions under its inherent authority. As the Supreme Court has explained, "[f]ederal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (cleaned up); *accord Nimitz Techs. LLC v. CNET Media, Inc.*, No. 1:21-cv-1247-CFC, 2022 WL 17338396, at *26 (D. Del. Nov. 30, 2022). Relevant here, "[t]hat authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Haeger*, 581 U.S. at 107 (cleaned up). One permissible sanction is an order "instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Id.* Dismissal is another. *See Damiani v. Detective Duffy*, No. 1:12-cv-1637-RGA, 2017 WL 635644, at *3 (D. Del. Feb. 16, 2017) ("It is clearly settled that a district court may dismiss a suit outright in response to litigation abuses.").

Here, Expedia Group submits that the conduct of CSL and its attorneys violated Rule 11, and the Court should dismiss this case with prejudice and award Expedia Group its attorneys' fees and expenses as sanctions for that Rule 11 violation. In the alternative, Expedia Group asks the Court to impose these sanctions using its inherent authority due to CSL's bad faith conduct.

### A.    Rule 11 Sanctions

#### 1.    *CSL and its attorneys violated Rule 11.*

Rule 11 states that by "presenting to the court a pleading, …an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b)(3). Thus, "Rule 11 imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing." *Bradgate Assocs., Inc. v. Fellows, Read & Assocs.*, 999 F.2d 745, 751 (3d Cir. 1993).

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances, with reasonableness defined as an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d

Cir. 1991); *see also Bradgate*, 999 F.2d at 752 ("We have consistently noted that the Rule 11 test is 'now an objective one of reasonableness' which seeks to discourage pleadings 'without factual foundation, even though the paper was not filed in subjective bad faith.'" (quoting *Lony v. E.I. Du Pont De Nemours & Co.*, 935 F.2d 604, 615 (3d Cir. 1991))). "When a district court examines the sufficiency of the investigation of facts and law, it 'is expected to avoid the wisdom of hindsight and should test the signer's conduct by [asking] what was reasonable to believe at the time the pleading, motion, or other paper was submitted.'" *Bradgate*, 999 F.2d at 752; *accord Scott v. Vantage Corp.*, 64 F.4th 462, 473 (3d Cir. 2023). That is not to say, however, that a litigant's obligations under Rule 11 are measured solely as of the time the offending papers are filed; rather, litigants and their counsel also have a duty to cease advocating or insisting on a position after learning that it has no merit. *See* Fed. R. Civ. P. 11(b) advisory committee's note to the 1993 amendment, reprinted at 146 F.R.D. 401, 585–86.

Here, CSL and its attorneys violated Rule 11 because any reasonable inquiry into the factual allegations concerning the purported March 7, 1996 assignments would have revealed that the allegations are false or, at the very least, lack evidentiary support.[4] As explained above, the "red flags" indicating that the assignments' notary page was falsified (i.e., the county name and notary commission expiration date) are apparent on the face of the document. Indeed, CSL's attorneys have now admitted that they knew that the notarization was backdated. (Ex. J ¶ 7.)

Notwithstanding this knowledge, CSL and its lawyers continued to insist that CSL's false allegations were true, adopting wholesale Gutiérrez's unbelievable and unsupported story that the assignments were notarized years after they were purportedly executed. They did this despite both Gutiérrez's history of fraudulently altering documents to support a lawsuit and the absence of any evidence corroborating Gutiérrez's story in this case. Worse still, they ignored the extensive evidence directly contradicting that story, including (i) the numerous indications on the face of the assignments and other available documents that the assignments were created at the same

---

[4] Of course, CSL itself did not need to conduct any inquiry to know that the allegations were false and fraudulent because it was one of CSL's officers, Gutiérrez, who orchestrated the fraud.

law firm and during the same time period as the notarization page, (ii) the other documents in CSL's possession—including CSL's formation documents, Gutiérrez's early correspondence with the State Department, and earlier affidavits—that are flatly inconsistent with a March 7, 1996 assignment; and (iii) the multiple inconsistencies and outright falsehoods in Gutiérrez's deposition testimony, including but not limited to the assertion that he did not possess any electronic files from the relevant law firms. *See supra* Part II. And when the native-file version of the assignments (along with many other supposedly non-existent electronic files) did somehow turn up, CSL's lawyers ignored the metadata proving what was already obvious: the assignments were not created—and, thus, were not executed—until years after March 7, 1996. *See supra* Part II.G.

Worse still, as all of the evidence of CSL's fraud mounted, CSL's lawyers just dug in further and threatened to seek countersanctions against Expedia Group and its lawyers if Expedia Group moved forward with its obviously meritorious motion for sanctions. (Ex. CC, Ltr. from R. Fields to D. Shank at 1 (Nov. 29, 2023).)

Put simply, it was never "reasonable to believe" that the assignments were executed on March 7, 1996. *Scott*, 64 F.4th at 473. CSL and its lawyers therefore violated Rule 11 when they filed the original and amended complaints alleging otherwise. *See id.*; *Vehicle Operation Techs. LLC v. Am. Honda Motor Co.*, 67 F. Supp. 3d 637, 652–53 (D. Del. 2014); *see also Mullins v. Allstate Ins.*, No. 4:05-cv-40118-PVG-RSW, 2007 WL 2156279, at *1 (E.D. Mich. July 25, 2007) ("In addition, counsel for Plaintiff failed to make an inquiry reasonable under the circumstances in an attempt to certify that the documents were authentic, which is a violation of Rule 11."). And they violated Rule 11 again when they continued to press that allegation in the SAC. *See* Fed. R. Civ. P. 11(b) advisory committee's note to the 1993 amendment, reprinted at 146 F.R.D. 401, 585–86.

In their letter threatening countersanctions, CSL's counsel contends that the declarations they procured from the three surviving signatories after Expedia Group served its Initial Motion for Sanctions somehow absolve their misconduct. (Ex. CC.) Not so. As an initial matter, one of

the declarants, Ms. Carta, admitted in her declaration that she did not actually recall signing the assignments on March 7, 1996. (Ex. W ¶ 3.) Another, Lillian Sanchez, admitted the same during her deposition. (Ex. Y, at 48:12–19, 61:15–62:17.) And although Alfredo Sanchez, like Gutiérrez, insists that the assignments were executed on March 7, 1996, CSL's lawyers may not blindly rely on their clients' assertions when other readily available evidence demonstrates that those assertions are false. *See Letren v. Trans Union, LLC*, No. CV PX 15-3361, 2017 WL 4098743, at *6 (D. Md. Sept. 15, 2017) ("If a reasonable inquiry would have demonstrated the client's assertions were untrue, or if other relevant documents and witnesses are readily available, it is unreasonable for counsel to rely exclusively on his client for factual support." (citation omitted)), *aff'd*, 770 F. App'x 95 (4th Cir. 2019). The evidence proving that Gutiérrez's and Mr. Sanchez's assertions about the execution of assignments is false has been available to CSL and its counsel since CSL filed its original complaint, and has been indisputably known to CSL's counsel for months. (*See, e.g.*, Ex. EE, Expedia Group's Objs. & Resps. Pl.'s 2d Set Interrogs.)

In any event, the signatories' declarations have no impact on what CSL's counsel reasonably believed when CSL filed the original and amended complaints because they did not speak to the declarants until after Expedia Group served its Initial Motion for Sanctions. (Ex. J, ¶ 8.) As the Third Circuit has repeatedly made clear, courts must "'avoid the wisdom of hindsight' when conducting Rule 11 inquiries." *Scott*, 64 F.4th at 473. In *Scott*, the plaintiffs alleged that the defendant illegally sold securities to unaccredited investors, but the complaint did not identify any individual unaccredited investors. *Id.* The defendant moved for Rule 11 sanctions, arguing that a reasonable investigation would have revealed that the allegation lacked evidentiary support. *Id.* In response, plaintiffs identified two supposed unaccredited investors and had one "sign a document stating that she was unaccredited." *Id.* The district court held that the plaintiffs' allegation still violated Rule 11 because "it was only with the benefit of hindsight" that the plaintiffs identified the two individuals. *Id.* (cleaned up). The Third Circuit affirmed, concluding, "the District Court applied the proper, forward-looking legal framework" by focusing on "what was reasonable to believe at the time the complaint was submitted." *Id.* (cleaned up).

Applying the proper, forward-looking legal framework here yields the same result. CSL's attempt to justify its sanctionable behavior by eliciting after-the-fact declarations from three octogenarian clients does not absolve their previous and ongoing failure to comply with Rule 11. To the contrary, their knowing (or at best reckless) solicitation of false testimony only makes matters worse.

### 2. *The Court should dismiss CSL's case and award Expedia Group its attorneys' fees and costs.*

When a court determines that Rule 11 has been violated, it "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Courts have "broad discretion" to determine appropriate sanctions under Rule 11. *E.g.*, *Soo San Choi v. D'Appolonia*, 252 F.R.D. 266, 274 (W.D. Pa. 2008) ("Once a court determines that Rule 11 has been violated, it retains broad discretion in determining appropriate sanctions.") (citing *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 811 (3d Cir. 1992)).

Here, Expedia Group asks the Court to dismiss this lawsuit with prejudice. *Vehicle Operation Techs.* is instructive. In that case, Judge Andrews dismissed a lawsuit pursuant to Rule 11, explaining: "Plaintiff's attorneys litigated this suit for over a year, without regard to the prosecution disclaimer that made this suit objectively baseless, or for that matter Rule 11's basic requirement for an adequate pre-suit investigation." *Vehicle Operation Techs.*, 67 F.Supp.3d at 653. Judge Andrews further noted that any lesser sanction would be ineffective, "as here the entire suit is objectively baseless." *Id.* The same result is warranted here. The false "assignments" render this suit "objectively baseless." No lesser sanction would be effective.

In addition to dismissal, Expedia Group requests that the Court order CSL and/or its attorneys to reimburse Expedia Group the attorneys' fees and expenses it has been forced to expend defending this meritless and bad-faith lawsuit. *See* Fed. R. Civ. P. 11(c)(4) ("The sanction may include, …if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."); *Shawe v. Potter Anderson & Corroon LLP*, No. 1:17-CV-1348-

18

JEJ, 2017 WL 6397342, at *4 (D. Del. Dec. 8, 2017). If the Court decides to award Expedia

Group its attorneys' fees and expenses, Expedia Group will submit evidence of its fees and ex-

penses at a date determined by the Court.

### B.    Inherent Authority Sanctions

"It has long been established that a 'court may safely rely on its inherent power' to levy

sanctions when parties engage in 'bad-faith conduct.'" *In re Theokary*, 592 F.App'x 102, 106 (3d

Cir. 2015) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)). "This authority includes

the ability to do whatever is reasonably necessary to deter abuse of the judicial process." *Id.*

(cleaned up). When exercising its inherent authority, a court must "consider the conduct at issue

and explain why the conduct warrants sanction." *Wronko v. Martin*, No. 3:16-cv-2288, 2018 WL

4562462, at *2 (D.N.J. Sept. 24, 2018) (quoting *Republic of Philippines v. Westinghouse Elec.*

*Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) (cleaned up)).

Dismissal is an appropriate sanction under the court's inherent authority. *See, e.g.*, *Dami-*

*ani*, 2017 WL 635644, at *3 ("It is clearly settled that a district court may dismiss a suit outright

in response to litigation abuses." (cleaned up)); *In re Theokary*, 592 F.App'x at 107 ("We con-

clude, therefore, that the Bankruptcy Court properly exercised its inherent authority by dismiss-

ing the adversary action…."). To determine whether dismissal is appropriate, courts in the Third

Circuit consider what are known as the *Poulis* factors:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adver-
> sary caused by the conduct at issue; (3) a history of dilatoriness; (4) whether the
> conduct of the party was willful or in bad faith; (5) the effectiveness of sanctions
> other than dismissal, which entails an analysis of other sanctions; and (6) the mer-
> itoriousness of the claim or defense.

*Damiani*, 2017 WL 635644, at *3 (citing *Poulis v. State Farm Fire & Cas.*, 747 F.2d 863, 868

(3d Cir. 1984)). "Not every factor must weigh in favor of dismissal so long as most do." *Id.* at *3.

Consideration of the *Poulis* factors supports dismissal here. First, CSL is clearly responsible for

the fabrication of evidence, as one of its officers, Gutiérrez, created the false notary page and has

repeatedly lied under oath about it. Second, Expedia Group has been prejudiced by this conduct,

as it has been forced to expend time and money defending a meritless lawsuit. Third, there is no

19

history of dilatoriness in this case. Fourth, CSL's and its attorneys' conduct was willful and in bad faith. As the Third Court has stated: "The submission of fabricated evidence…always constitutes egregious misconduct." *In re Theokary*, 592 F.App'x at 108; *see also Oniha v. Delta Air Lines, Inc.*, No. 21-13532, 2022 WL 580933, at *2 (11th Cir. Feb. 25, 2022). Fifth, no sanction short of dismissal would be effective for CSL's bad-faith conduct. *See, e.g.*, *Oniha*, 2022 WL 580933, at *2 ("The court did not abuse its discretion in concluding that given the severity of Oniha's misconduct [which involved fabrication of evidence], no sanction short of complete dismissal would be sufficient to deter future misconduct and 'vindicat[e] judicial authority.'"); *In re Theokary*, 592 F.App'x at 107. Sixth and finally, CSL's claim is not meritorious. The evidence shows that CSL did not acquire ownership of any claims to the allegedly trafficked property until the summer of 2000—more than four years after the statutory cutoff. Thus, dismissal with prejudice is an appropriate sanction for CSL's and/or its attorneys' conduct.

Finally, Expedia Group requests that the Court award Expedia Group its attorneys' fees and expenses under its inherent authority. This is warranted due to CSL's and its attorneys' bad faith conduct, detailed above. *See Citrix Sys., Inc. v. Workspot, Inc.*, No. 1:18-cv-588-LPS, 2020 WL 5884970, at *6 (D. Del. Sept. 25, 2020) ("Sanctions such as dismissal and attorney's fees are within a court's inherent power to order when a party's conduct evidences bad faith and an attempt to perpetrate a fraud on the court."); *Wronko*, 2018 WL 4562462, at *2 ("The sanction of attorney's fees requires a finding of bad faith.").

## IV.    <u>CONCLUSION</u>

For the reasons described above, Expedia Group asks that the Court sanction CSL's lawyers, CSL, or both under Rule 11 or its inherent powers by dismissing CSL's Helms-Burton claim with prejudice and awarding Expedia Group its attorneys' fees and expenses. Expedia Group further requests such other and further relief to which it may be entitled.

20

Dated: May 28, 2024

OF COUNSEL:

SCOTT DOUGLASS & MCCONNICO LLP

    David D. Shank (*pro hac vice*)
    Cheryl Joseph LaFond (*pro hac vice*)
    Mary Byars (*pro hac vice*)
    Jane Webre (*pro hac vice*)
    Kennon L. Wooten (*pro hac vice*)
    Rebecca Jahnke (*pro hac vice*)
    303 Colorado Street, Suite 2400
    Austin, Texas 78701
    (512) 495-6300
    dshank@scottdoug.com
    clafond@scottdoug.com
    mbyars@scottdoug.com
    jwebre@scottdoug.com
    kwooten@scottdoug.com
    bjahnke@scottdoug.com

BALLARD SPAHR LLP

By:   */s/ Beth Moskow-Schnoll*
    Beth Moskow-Schnoll (#2900)
    Brittany M. Giusini (#6034)
    919 N. Market St., 11th Floor
    Wilmington, DE 19801
    (302) 252-4465
    moskowb@ballardspahr.com
    giusinib@ballardspahr.com

*Attorneys for Expedia Group, Inc.*

<u>Rule 7.1.1. Certification</u>

Pursuant to D. Del. LR 7.1.1, counsel for Expedia Group made a reasonable effort to reach agreement with CSL on the matters set forth in the Motion. Further, pursuant to Fed. R. Civ. P. 11, Expedia Group served the Motion on May 6, 2024. More than 21 days have elapsed since that date, and CSL has not withdrawn or appropriately corrected the issues, claims and contentions challenged in the Motion.

By:  */s/ Beth Moskow-Schnoll*
Beth Moskow-Schnoll

4878-0151-8231